610 So.2d 374 (1992)
Geraldine HURST, Executrix of the Estate of Josie Connerly, Geraldine Hurst, and Kenneth Hurst
v.
SOUTHWEST MISSISSIPPI LEGAL SERVICES CORP. and Hilda Burnett.
No. 89-CA-1185.
Supreme Court of Mississippi.
December 10, 1992.
*376 Jerry L. Mills, John T. Wakeland, Pyle Dreher Mills & Woods, Jackson, for appellants.
Tomie T. Green, John L. Walker, Jr., Walker Walker & Green, Jackson, for appellees.
Before HAWKINS, P.J., and PRATHER and McRAE, JJ.
McRAE, Justice, for the court:
Appellants ("the Hursts" unless otherwise indicated) filed suit against Southwest Mississippi Legal Services and attorney Hilda Burnett ("Southwest and Burnett" unless referred to separately) in the Circuit Court of Pike County seeking damages for legal negligence and tortious breach of contract. The court granted summary judgment in favor of Southwest and Burnett. On appeal, the Hursts assert that the trial court erred by not permitting the case to proceed to trial. Southwest and Burnett have cross-appealed on grounds (1) that the trial court erred in failing to dismiss Josie Connerly as a party plaintiff; and (2) that the trial court erred in refusing to dismiss Hilda Burnett as a party defendant. Southwest and Burnett also assert that the appeal is frivolous and seek sanctions pursuant to MSCR Rule 38. Finding that a genuine question of material fact exists concerning whether Southwest and Burnett are liable for legal negligence, we reverse the entry of summary judgment and remand for trial. On the cross-appeal, we deny Southwest's and Burnett's request for sanctions and affirm the trial court's denial of motions to dismiss Josie Connerly as a party plaintiff and to dismiss Hilda Burnett as a party defendant.

FACTS
In 1923, one Dewitt Connerly purchased the land involved in this suit and established a residence thereon. In 1937, he forfeited the property to the State of Mississippi for failure to pay taxes but continued to live there. The State of Mississippi conveyed the property to W.A. Pritchard on March 7, 1944.
On March 29, 1947, W.A. Pritchard quit-claimed the property to Dewitt Connerly's daughter, Josie Connerly, who had maintained a residence on the land following her father's death in 1943. The quitclaim deed contained a clause reserving all minerals to Pritchard. Two days later, on March 31, 1947, Pritchard deeded the mineral rights to Roy Ellzey.
In 1954, Josie Connerly conveyed three acres of the property to Kenneth and Geraldine Hurst as a homesite. Mr. and Mrs. Hurst sought a VA loan, but due to the 1937 tax sale, they were required to confirm their title in order to obtain financing. They filed suit in due course, and on February 15, 1955, the Chancery Court of Pike County confirmed fee simple title in Mr. and Mrs. Hurst. The court found that Mr. and Mrs. Hurst's predecessor had good title by virtue of both adverse possession and the quitclaim deed from W.A. Pritchard.
In 1979, the heirs of Roy Ellzey brought suit to confirm title to the minerals and named Josie Connerly and Mr. and Mrs. Hurst as defendants. Southwest undertook the defense and assigned the case to its employee, Hilda Burnett. Burnett filed an answer in January of 1980 which included no affirmative defenses. The case was set for trial on June 27, 1980. On June 26, the day before the trial, Burnett filed a suit on behalf of Josie Connerly and Mr. and Mrs. Hurst seeking to have the 1944 tax title set aside. Burnett also filed a motion for a stay in the Ellzey title confirmation proceedings pending resolution of the newly-filed suit. The court denied the motion for a stay and considered both matters jointly at the June 27th trial.
At trial, the defense sought to prove that Dewitt Connerly had in fact paid his taxes *377 in 1937 and that the State of Mississippi did not follow proper forfeiture procedures, thus rendering the 1944 tax deed void. The court refused to admit the evidence, however, on grounds that the defendants had failed to specifically plead defects in the forfeiture proceedings as required by statute. Burnett raised no other defense and engaged in no cross-examination. The court entered judgment confirming that Roy Ellzey's heirs held title to the contested mineral rights.
Burnett perfected an appeal on behalf of the defendants, but she never filed a brief despite repeated extensions. Burnett procured the extensions on grounds that settlement negotiations were in progress. In their briefs, the Hursts assert that no settlement negotiations ever occurred.
The appeal was ultimately dismissed for lack of prosecution. The Hursts allege that neither Burnett nor Southwest told them about the dismissal. The Hursts claim to have discovered the dismissal some years later after hiring another attorney to find out when their appeal would be heard.

PROCEEDINGS BELOW
On June 5, 1986, Josie Connerly along with Mr. and Mrs. Hurst filed a complaint naming Southwest and Burnett as defendants. The complaint, as later amended, included two counts. The first count sought actual damages in the amount of $800,000 for legal negligence. The second count sought $500,000 in actual damages and $2,500,000.00 in punitive damages for tortious, bad faith breach of contract. Southwest was personally served with process on June 16, 1986.
Southwest answered the complaint on July 31, 1986, and immediately initiated a copious flow of discovery requests and motions.[1] On February 2, 1989, Southwest filed a motion for summary judgment.
On September 18, 1989, Southwest filed a motion to dismiss Burnett as a party defendant on grounds of improper service of process. Burnett joined the motion on September 20. The trial court quashed the attempted service of process on Burnett but refused to grant the motion to dismiss. On October 11, 1989, the plaintiffs amended their complaint by substituting the Estate of Josie Connerly as a party plaintiff following the death of Josie Connerly in June of 1989.
The case came on for trial on October 13, 1989, and a jury was empaneled. Before either party put on any proof, however, the court conducted a hearing on Southwest's motion for summary judgment and granted it. This appeal and cross-appeal followed.

LAW

I.

WHETHER THE TRIAL COURT ERRED IN GRANTING SOUTHWEST'S MOTION FOR SUMMARY JUDGMENT?
In his Judgment of Dismissal with Prejudice, the trial judge found as a matter of law that the plaintiffs could not have prevailed in their defense against Ellzey's 1979 suit. Consequently, the judge concluded, any injury or damages the plaintiffs suffered could not have been proximately caused by negligence on the part of their attorney. The judgment does not expressly address the plaintiffs' tortious breach of contract claim. It may be presumed, however, that the judgment covers the bad faith count since the judge granted Southwest's summary judgment motion "in toto" and dismissed the action with prejudice. In the following discussion we shall address the negligence and bad-faith claims separately. We shall also address Southwest's and Burnett's contention that the appellants waived their right to appeal the grant of summary judgment by failing to file a response to the summary judgment motion. Lastly, we shall consider the propriety of hearing a motion for summary judgment after a case is already poised for trial with a jury in place, and where the plaintiff receives no advance notice of the hearing.

*378 A.

The Legal Negligence Claim
The Hursts contend that they would have prevailed as a matter of law in the 1979 suit if Burnett had raised adverse possession as an affirmative defense. The validity of the Hursts' title to the property by virtue of adverse possession was established by the 1955 chancellor's decree which stated:
The said Josie Connerly lived on the land, cultivated the same, tended the same, and held the same openly, notoriously and adversely from the time it was patented [in 1944] by the State of Mississippi until the present time, and that she has perfected a good, valid title by adverse possession of the land, which has cured any defects that may have been in her title, in addition to the fact that she holds a good record title to the land.
The Hursts maintain that Burnett's negligent failure to assert the adverse possession defense directly and proximately caused them to lose their mineral rights.
In response, Southwest and Burnett first suggest that Josie Connerly may have never adversely possessed the subject property at all. This argument fails to recognize the res judicata effect of the 1955 chancery judgment which expressly stated that Josie Connerly had adversely possessed the land. The 1955 judgment clearly establishes, once and for all, that Josie Connerly had obtained a valid title to "the land" by adverse possession. The only real question, then, is whether "the land" that Connerly adversely possessed included both surface and mineral rights, or, as Southwest and Burnett contend, surface rights alone.
The case essentially turns on this point. If "the land" to which the 1955 judgment refers included mineral rights, then the Hursts would probably have been entitled to judgment as a matter of law in the 1979 suit had Burnett only raised the affirmative defense of adverse possession. If, on the other hand, "the land" referred only to surface rights, then the defense of adverse possession would not have been available in the 1979 action. In deciding whether "the land" to which the 1955 judgment refers included mineral rights, we are confronted with a two-fold question:
(1) could Connerly have adversely possessed the minerals without exercising control over them; and
(2) did Connerly relinquish her adverse claim to the minerals by accepting a quitclaim deed from Pritchard which contained a clause "reserving" the minerals to Pritchard?

1.

Could Connerly Have Adversely Possessed the Minerals Without Exercising Control Over Them?
At the time when Connerly began to adversely possess the land, the mineral rights had not been severed. The law is clear that where one adversely possesses surface rights, unsevered mineral rights are also possessed by implication. Unless a severance has occurred, the party in adverse possession of the surface need not exercise active dominion over the minerals in order to perfect a valid title to both surface and minerals. See Turner Lumber Co. v. Beckham, 277 So.2d 110, 112 (Miss. 1972) (mere adverse possession of surface implies adverse possession of minerals where adverse possession of surface pre-dates recorded severance); accord Huddleston v. Peel, 238 Miss. 798, 119 So.2d 921 (1960). Other jurisdictions agree with virtual unanimity. See, e.g., Sachs v. Board of Trustees, 89 N.M. 712, 557 P.2d 209 (1976) (before severance of subsurface minerals, possession of surface implies possession of minerals below); Broadhurst v. American Colloid Co., 85 S.D. 65, 177 N.W.2d 261 (1970) (if title to minerals has not been severed from title to surface, adverse possession of surface for prescribed period will give title to both surface and minerals); Henley v. United States, 396 F.2d 956, 184 Ct.Cl. 315 (1968) (adverse possession that begins before severance is adverse possession of minerals as well as of surface); see also Peterson v. Simpson, 286 Ark. 177, 690 S.W.2d 720 (1985); General Refractories Co. v. Raack, 674 S.W.2d 97 (Mo. Ct. App. 1984); Jackson v. Reed, 114 *379 Ill. App.3d 36, 69 Ill.Dec. 766, 448 N.E.2d 226 (1983); Fadem v. Kimball, 612 P.2d 287 (Okl.Ct.App. 1979); Thornock v. Cook, 604 P.2d 934 (Utah 1979); Van Slooten v. Larsen, 86 Mich. App. 437, 272 N.W.2d 675 (1978); McDaniel v. Williams, 429 S.W.2d 640 (Tex.Civ.Ct.App. 1968); Knott Coal Corp. v. Kelly, 417 S.W.2d 253 (Ky. 1967); Mountain Mission School, Inc. v. Buchanan Realty Corp., 207 Va. 518, 151 S.E.2d 403 (1966). An attempted severance of mineral rights by the record title holder at any time after the adverse claimant enters possession is invalid. Huddleston, 119 So.2d at 923 (where record title holder attempts to sever mineral interests after adverse claimant enters possession, "the adverse possession will continue as if there had been no conveyance of the mineral estate"); accord Ates v. Yellow Pine Land Co., 310 So.2d 772 (Fla.Ct.App. 1975) (conveyance of subsurface interests by one not in possession while another is in adverse possession will not toll or affect running of adverse possession as to subsurface interests).
In the instant case, Pritchard, the record title holder, attempted to sever the mineral rights and convey them to Ellzey after Connerly began to adversely possess the property. Assuming arguendo that Connerly did not otherwise relinquish her claim to the mineral rights, Ellzey's attempted severance was ineffective and Connerly's adverse possession continued to run to both surface and minerals.
We will now turn our attention to the question of whether Connerly relinquished her claim to the minerals prior to Pritchard's conveyance to Ellzey.

2.

Did Connerly Relinquish Her Claim to the Mineral Rights by Accepting a Quitclaim Deed from Pritchard Which Contained a Clause "Reserving" the Minerals to Pritchard?
Southwest and Burnett contend that Connerly waived her adverse claim to the minerals by accepting Pritchard's quitclaim deed containing a clause "reserving" the mineral rights to Pritchard. The merit of Southwest's and Burnett's position turns in part on whether the subject clause sets out a "reservation" or an "exception."
A "reservation" constitutes an implied reconveyance from the grantee to the grantor. Federal Land Bank of New Orleans v. Cooper, 190 Miss. 490, 200 So. 729, 730 (1941). An "exception," on the other hand, is merely an expression of what the grantor is not conveying. Cook v. Farley, 195 Miss. 638, 15 So.2d 352, 356 (1943); Cooper, 200 So. at 730. Under Mississippi law, an express retention of mineral rights is an "exception" even if the instrument uses the term "reservation." Salmen Brick & Lumber Co. v. Williams, 210 Miss. 560, 50 So.2d 130 (1951); Cooper, 200 So. at 730-31. The clause in Pritchard's quitclaim deed therefore created an "exception" and not a "reservation." Accordingly, Connerly did not implicitly reconvey the mineral interests to Pritchard upon accepting the deed. Rather, the deed merely indicates an interest which Pritchard did not intend to convey.
A person who is adversely possessing a tract of land does not relinquish his claim to the whole by accepting a deed from the record title holder which conveys only part. 3 Am.Jur.2d Adverse Possession § 119 states:
A person in adverse possession of land generally may fortify the right thereto by acquiring any outstanding interest without weakening the force or effect of the possession... . One claiming adversely may, and usually does, desire, in making the purchase, merely to protect possession and to avoid possible litigation, and the claimant should not be deemed to have intended to abandon a title by conduct the purpose of which was to strengthen title.... [When an adverse possessor acquires an outstanding interest], there is nothing partaking of the nature of an acknowledgement of the superiority of that title, or an abandonment of one's former claim.
Viewed in this light, Connerly's acceptance of Pritchard's quitclaim deed was merely an effort to fortify her adverse claim. Even though the deed did not convey the *380 mineral interests, Connerly is not deemed to have abandoned her adverse claim to the minerals by accepting such interest as Pritchard was willing to convey.
One could argue, however, that Connerly contractually waived her right to claim a mineral title through adverse possession. In Thomas v. Hinson, 223 Miss. 607, 78 So.2d 611 (1955), this Court held that under certain circumstances, accepting a deed containing a mineral exception can amount to a waiver of the right to claim minerals by adverse possession. In Thomas, one E.T. Amaker was living on land owned by Mrs. Mabel Hinson. L.W. Hinson, Mabel's husband, believing in good faith that the property belonged to him, conveyed the tract to Amaker's daughter, Myrtis Thomas, in 1943. The record suggests that Mr. Hinson stated prior to the conveyance that he would reserve one-half of the minerals. The deed, however, contained no mineral exception clause. Three years later, in 1945, Thomas learned that Mr. Hinson had never held title to the property. Thomas, through counsel, began to negotiate with Mabel Hinson, the legal owner. Mrs. Hinson agreed to convey the property to her husband, Mr. Hinson, but she insisted on excepting one-half of the minerals. Thomas eventually accepted and recorded this deed from Mabel Hinson to her husband.
During the ensuing years, Thomas engaged in conduct which implicitly recognized the one-half exception. She arranged with Mr. Hinson and Gulf Oil Refining Company to receive one-half of Gulf's oil-lease rental payments and thereafter accepted a share of the lease payments based on a one-half interest. In a 1950 letter to Mr. Hinson, she wrote: "As you know the rental is sixty dollars a year on the whole place, but as I compromised with you, it will be thirty dollars per year." In 1953, Thomas sold part of her mineral rights in three separate conveyances. Each of these three mineral deeds indicated that she owned a one-half interest in the minerals.
Thomas later sued to cancel the exception clause in Mrs. Hinson's deed. The chancellor found for Mrs. Hinson. On appeal, this Court held:
The chancellor was correct in holding that the 1946 deed from Mrs. Hinson to her husband, in which she reserved one-half of the minerals, was the result of a compromise and settlement with [Thomas], and that it was an accord and satisfaction with her. The deed was obtained with full knowledge by [Thomas] of the exception, and she recognized it as a valid deed for more than seven years before filing this suit... . Her letter to Mr. Hinson of September 1950 expressly recognized the compromise effected by this deed.
Thomas, 223 Miss. at 616, 78 So.2d at 614. The Court thus held that since the deed from Mrs. Hinson to Mr. Hinson amounted to a compromise and settlement of Thomas' disputed claim, and since Thomas had expressly acknowledged and acted in accordance with the exception for several years, then Thomas was contractually estopped from asserting an adverse claim to the entire mineral estate. See Thomas, 223 Miss. at 617, 78 So.2d at 614.
In the instant case, facts may exist which show that the quitclaim deed from Pritchard to Connerly amounted to an accord and satisfaction with respect to the minerals underlying the surface of the land, or that Connerly subsequently engaged in conduct which would estop her from asserting an adverse claim to minerals. As of yet, however, Southwest and Barnett have made no such showing. It is therefore clear that a genuine issue of material fact exists concerning whether the defense of adverse possession was viable in Ellzey's 1979 confirmation suit.
Lastly, Southwest and Burnett argue that even if the 1955 judgment implicitly held that Josie Connerly had adversely possessed both surface and mineral estates, the judgment did not affect Ellzey's legal interest in the minerals because he did not receive legal notice of the 1955 action. See Baker v. Williams, 503 So.2d 249, 254 (Miss. 1987) (decree in equity cannot adjudicate rights or liabilities of persons not party to proceedings); see also Paepcke-Leicht *381 Lumber Co. v. Savage, 137 Miss. 11, 101 So. 709 (1924) (decree not valid against persons known but not named as defendants). Southwest and Burnett also argue that the 1955 judgment could not have adjudicated mineral rights since the parties to the 1955 suit were concerned only with surface rights necessary to obtain a VA loan. See Gillum v. Gillum, 230 Miss. 246, 255-56, 92 So.2d 665, 669 (1957) (judgment must be construed in sight of issues raised and matters intended to be decided).
Southwest's and Burnett's arguments miss the point. The only element of the 1955 judgment essential to the Hursts' defense in the 1979 suit was the chancellor's general finding that Josie Connerly had acquired title to the property by adverse possession. Even if the 1955 ruling did not apply to or was not binding with respect to Ellzey's mineral claim, introduction of the judgment as evidence in the 1979 suit would at least have collaterally estopped Ellzey from attacking Josie Connerly's adverse title to the surface. Josie Connerly and Mr. and Mrs. Hurst could then have established by reference to Beckham and Huddleston that the adverse possession of the surface necessarily entailed the adverse possession of the minerals since the mineral estate had not been "previously severed." The Court would then have been presented with a question of fact concerning whether Connerly had waived her claim under Thomas.
Based on the record now before us, it appears that Josie Connerly and Mr. and Mrs. Hurst could possibly have prevailed in the 1979 action if their attorney had raised the affirmative defense of adverse possession. Of course, Southwest and Burnett may be able to show otherwise by establishing that Connerly relinquished her adverse claim to the minerals upon or after accepting the quitclaim deed from Pritchard containing an exception clause. As the matter now stands, however, a genuine issue of material fact exists concerning whether Burnett negligently breached her duty to her clients, and, if so, whether her negligence caused the appellants' injury. See Hickox v. Holleman, 502 So.2d 626 (Miss. 1987) (in addition to existence of attorney-client relationship, elements in legal negligence action include negligence on part of attorney in handling affairs entrusted to him by client and proximate cause of injury); see also Stewart v. Walls, 534 So.2d 1033 (Miss. 1988); Dean v. Conn, 419 So.2d 148 (Miss. 1982).
Since a genuine issue of material fact exists on these points, the lower court erred in granting summary judgment to the defendants. See Palmer v. Biloxi Regional Medical Center, Inc., 564 So.2d 1346, 1355 (Miss. 1990) (party moving for summary judgment bears burden of demonstrating that no genuine issue of material fact exists and that he is entitled to judgment as matter of law); see also American Legion Ladnier Post No. 42, Inc. v. City of Ocean Springs, 562 So.2d 103, 106 (Miss. 1990); Newell v. Hinton, 556 So.2d 1037, 1041 (Miss. 1990). The Hursts were entitled to a trial on their legal negligence claim.

B.

The Tortious Breach of Contract Claim
The Hursts acknowledged in pretrial that "under no circumstances" could they have won the 1979 case on appeal following Burnett's failure to raise the appropriate defenses at trial. Counsel for the Hursts further stated to the court that they "cannot and will not prove" all the elements of negligence with respect to the 1980 appeal. The Hursts maintained nevertheless that Burnett's failure to properly pursue the appeal constituted a bad faith breach of contract.
Neither Southwest's motion for summary judgment nor anything filed in connection therewith makes any reference to the Hursts' bad-faith claim. Obviously, therefore, Southwest and Burnett did not demonstrate the absence of a genuine issue of material fact as to the bad-faith count. The trial court apparently concluded sua sponte that the bad-faith claim was not legally supportable. Following stipulation by plaintiffs' counsel that the Hursts could not prove negligence with respect to the *382 appeal, the transcript records the following exchange:
BY THE COURT: [I]f there is no claim that there was negligence as to the appeal, well, then, I think that pretty well is going to resolve the hearing.
BY MR. MILLS [COUNSEL FOR PLAINTIFF]: We believe it would as to the negligence part. Now, the law in the State as I understand it, and I may not be correct, is that legal malpractice cases can be brought on two bases. One is breach of contractual obligation; second is the negligence.
BY THE COURT: Well, I haven't seen any contract.
BY MR. MILLS: There is a contract implied by law.
.....
BY THE COURT: ... I don't think that the defendant was under an obligation by any contract to do something that was vain, that had no possibility of a satisfactory solution. That is if there was no chance of success in the appeal, I don't think that the defendant was under an obligation to appeal.
BY MR. MILLS: Well, Your Honor, I would agree that there was no obligation to institute the appeal. There is a very specific manner in which the Supreme Court has said you must withdraw... . We do contend that the attorney client relationship was improperly breached; that it was done intentionally, and that this is an intentional breach of contract which would entitle the Plaintiffs to recover both actual and punitive damages, much as in the bad faith insurance cases.
BY THE COURT: ... I don't think that as a public policy that we ought to penalize by punitive damages an attorney who in good conscience has looked at the record and has determined that there is no chance to prevail.
Assuming arguendo that Burnett did in fact abandon the appeal without ever informing her clients, it is evident that she breached an implied contractual duty. In Myers v. Mississippi State Bar, 480 So.2d 1080 (Miss. 1986), this Court stated:
We take this occasion to announce ... that any time an attorney undertakes to represent a client in any court of record in this state that there attaches at that moment a legal, ethical, professional and moral obligation to continue with that representation until such time as he is properly relieved by the court of record before whom he has undertaken to represent a client. This is true regardless of the circumstances under which his representation of that client may be terminated. This withdrawal may be accomplished only by the filing of a motion with the court with proper notice to the client.
Myers, 480 So.2d at 1092. As the trial judge correctly noted, Burnett was not duty bound to undertake a futile appeal. But having done so, she incurred an obligation to press ahead absent a proper withdrawal.
Southwest and Burnett advance three arguments supporting the grant of summary judgment against the plaintiffs on the bad-faith breach of contract claim. First, Southwest and Burnett argue that since the Hursts allege a failure to properly withdraw, the claim would be better addressed as a bar disciplinary matter rather than as a breach of contract. Secondly, Southwest and Burnett contend that since the Hursts' first count alleges the tort of negligence, the election of remedies doctrine precludes the plaintiffs from also alleging a breach of contract. Thirdly, Southwest and Burnett assert that the breach of contract claim is barred by the applicable statute of limitations.
None of these three arguments has merit. Abandoning representation without proper withdrawal is indeed a matter for disciplinary inquiry. Myers holds, however, that an attorney's obligation to continue representation once undertaken is both ethical and legal in nature. Myers, 480 So.2d at 1092. See also Hutchinson v. Smith, 417 So.2d 926 (Miss. 1982) (law implies promise that attorney will represent client with care, skill, and diligence). If Burnett's alleged breach of this legal obligation was attended by intentional wrong, *383 gross negligence or breach of fiduciary duty amounting to an independent tort, then the plaintiffs' bad faith claim would be well grounded in law and fact. See State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242, 249 (Miss. 1985) (punitive damages recoverable for tort of bad faith if breach of contract amounts to intentional wrong, insult, abuse or gross negligence amounting to independent tort); United States ex rel. Control Systems, Inc. v. Arundel Corp., 814 F.2d 193 (5th Cir.1987).
Southwest's and Burnett's remaining two arguments are easily disposed of by noting that the Hursts' second count alleges the tort of bad faith, not a breach of contract per se. This Court has held that in legal malpractice cases, a plaintiff must elect between tort and contract remedies in certain situations. See Hutchinson, 417 So.2d at 928.[2] Since both counts in the instant action sound in tort, the election-of-remedies rule does not arise. Southwest's and Burnett's limitations argument is similarly misemployed. Southwest and Burnett correctly observe that the statute of limitations for actions based on unwritten contracts is three years. See Miss. Code Ann. § 15-1-29. The Hursts' cause of action arguably accrued more than three years before the suit was filed. This is not an action, however, to enforce a contract. The Hursts alleged the independent tort of bad faith, a matter covered by the six-year general limitation found in Miss. Code Ann. § 15-1-49.[3]See Young v. Southern Farm Bureau Life Ins. Co., 592 So.2d 103 (1991). The claim is thus unaffected by the § 15-1-29 three-year limitations bar.
Southwest and Burnett failed to establish the absence of a genuine issue of material fact, and they have not shown that they are entitled to judgment as a matter of law. The trial court erred, therefore, in granting the motion for summary judgment with respect to the bad faith claim.

C.

The Hursts' Lack of Response To Southwest's Motion for Summary Judgment
In their reply brief, Southwest and Burnett argue that by failing to file a response to the motion for summary judgment, the Hursts waived their right to challenge the judgment. This Court has held that when a motion for summary judgment is filed, the non-moving party "must rebut by producing significant probative evidence showing that there are indeed genuine issues for trial." McMichael v. Nu-Way Steel & Supply, 563 So.2d 1371, 1375 (Miss. 1990); Newell v. Hinton, 556 So.2d 1037, 1041 (1990). This burden of rebuttal arises, however, only after the moving party has satisfied its burden of demonstrating that no genuine issue of material fact exists. Otherwise, there would be nothing for the non-moving party to "rebut." Our rules do not require a party to file a formal response to a motion for summary judgment. Rule 56(e) states:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
(Emphasis added). The rule does not entitle a party to summary judgment by default where the non-moving party files no response. Even in the absence of a response, the court may enter judgment only "if appropriate;" i.e., if no genuine issue of *384 material fact exists. Rule 56(c) likewise implies that a response is optional by suggesting that "[t]he adverse party prior to the day of the hearing may serve opposing affidavits." (Emphasis added). Stated conversely, a party need not serve such affidavits if what he has already placed before the court demonstrates a triable issue of material fact notwithstanding the opposing party's motion for summary judgment. A trial court must deny a summary judgment motion, even if the non-moving party makes no response whatsoever, so long as all the data before the court, including "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," viewed in the light most favorable to the non-moving party, raises a triable issue concerning a disputed material fact. See Rule 56(c); Brown v. Credit Center, Inc., 444 So.2d 358, 362 (Miss. 1983).
In the instant case, Southwest built its summary judgment motion around the proposition that Burnett's acts, as a matter of law, did not cause the plaintiffs' injury. The voluminous exhibits to Southwest's motion for summary judgment contain nothing to demonstrate that the defendants were entitled to prevail as a matter of law. Consequently, the risk of non-persuasion never shifted to the Hursts. Their failure to file a response to Southwest's motion for summary judgment does not amount to a waiver of their right to appeal from the trial court's grant of summary judgment.

D.

The Propriety of Granting Summary Judgment After A Jury Is Empaneled
On the morning of trial, after a jury had already been selected and empaneled and the parties had both made opening statements, the trial court heard and granted Southwest's motion for summary judgment. This unusual sequence of events requires us to reflect upon the timing of summary judgment hearings in light of the underlying purposes of such proceedings.
The summary judgment procedure represents a compromise between litigants' constitutional right to trial by jury and the judicial system's need to streamline its crowded dockets. See Brown, 444 So.2d at 362-63; see also 6 Moore's Federal Practice § 56.15 (1982). Since a constitutional right is at stake, however, motions for summary judgment "should be granted with great caution." Brown, 444 So.2d at 363.
Trial judges must be sensitive to the notion that summary judgment may never be granted in derogation of a party's constitutional right to trial by jury. Miss. Const. art. 3, § 31 (1890)... . "If there is to be error at the trial level it should be in denying summary judgment and in favor of a full live trial."

Brown, 444 So.2d at 362-63 (quoting 6 Moore's Federal Practice § 56.15[1]-[2] (1982) (emphasis added).
In the case before us, we find that the trial court's action served few, if any, of the pragmatic rationales for summary judgment. The court had already set aside a block of time in which to try this case, and it was much too late to substitute another case. The parties, along with their witnesses, were present and prepared to proceed with the trial. The daily routine of the veniremen had already been interrupted; the jury was empaneled and ready to hear the evidence. The advance in judicial economy resulting from the trial court's grant of summary judgment was thus minuscule at best, and the benefits of granting Southwest's motion clearly failed to outweigh the Hursts' right to have a full jury trial on the merits of their claims.
We hold that the commencement of trial closes the season for granting motions for summary judgment. Where trial has already begun, it is far preferable to allow the plaintiff to present his case in chief and then, if the plaintiff has failed to meet his burden of proof, direct a verdict in favor of the defendant.

E.

The Necessity of Giving An Adverse Party Advance Notice of A Summary Judgment Hearing
The record reveals that the trial court never fixed a date for hearing Southwest's *385 motion for summary judgment prior to October 13, 1989, the day on which the motion was granted. MRCP Rule 6(d) states: "A written motion, other than one which may be heard ex parte, and notice of the hearing thereof, shall be served not later than five days before the time fixed for the hearing, unless a different period is fixed by these rules or by order of the court." Rule 56(c) requires a ten-day advance notice for summary judgment hearings. In Pope v. Schroeder, 512 So.2d 905 (Miss. 1987), this Court held that the ten-day notice requirement is to be strictly enforced and further noted that failure to provide such notice constitutes reversible error:
In Western Fire Insurance Co. v. Copeland, 786 F.2d 649, 652 (5th Cir.1986), the court stated:
Importantly, Rule 56(c) prescribes a ten-day notice period prior to the district court's granting a motion for summary judgment; this Court has noted its strict enforcement of this opportunity to be heard. Hanson v. Polk County Land, Inc., 608 F.2d 129, 131 (5th Cir.1979). "The ten-day notice provision of Rule 56 is not an unimportant technicality, but serves substantial interests of litigants before federal courts." Id. This Court has noted that a party should not "los[e] its case without a full opportunity to be heard." Georgia Southern & Florida Railway Co. v. Atlantic Coast Line Railroad Co., 373 F.2d 493, 497 (5th Cir.), cert. denied, 389 U.S. 851, 88 S.Ct. 69, 19 L.Ed.2d 120 (1967).
.....
Thus, we cannot stress too strongly that a trial court should require compliance with Rule 56(c) before entertaining a motion for summary judgment. The failure to do so here was error which requires reversal.
Pope, 512 So.2d at 908.
In Pope, the movant filed neither a motion for summary judgment nor a notice of hearing prior to the day on which summary judgment was granted. In the instant case, Southwest filed its motion for summary judgment several months before it was heard, but the Hursts never received notice of a fixed hearing date. When they arrived at the courthouse on the morning of October 3, 1989, they came prepared to try a case, not to argue against a motion for summary judgment. Due to Southwest's failure to supply sufficient notice of the hearing on its motion for summary judgment, the grant of summary judgment was improper.
For all the foregoing reasons, we hold that the trial court erred in granting Southwest's motion for summary judgment.

II.

WHETHER THE TRIAL COURT ERRED IN FAILING TO DISMISS JOSIE CONNERLY AS A PARTY PLAINTIFF?
Josie Connerly died during the first week of June, 1989, and Southwest filed a Suggestion of Death on June 12, 1989. On June 9, 1989, Southwest served a copy of the Suggestion of Death by first class mail on John Wakefield, attorney for the plaintiffs. Geraldine Hurst was named executor of Connerly's estate and plaintiffs' counsel was retained to represent it. On September 13, 1989, about ninety-two days after the Suggestion of Death was filed, Southwest moved to Dismiss Josie Connerly as a party Plaintiff for failure of the plaintiffs to seek substitution. On September 22, 1989, the plaintiffs filed a response which included a motion for additional time to file for substitution. The trial court denied Southwest's motion to dismiss Josie Connerly and permitted the plaintiffs to amend their complaint in order to substitute the Estate of Josie Connerly in the place of plaintiff Josie Connerly, deceased.
MRCP Rule 25 provides:
If a party dies and the claim is not thereby extinguished, the court shall, upon motion, order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of *386 hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of summons. The action shall be dismissed without prejudice as to the deceased party if the motion for substitution is not made within ninety days after the death is suggested upon the record by service of a statement of the fact of the death as herein provided for the service of the motion.
Southwest and Burnett argue that since Rule 25 mandates the dismissal of a deceased party where no motion to substitute is filed within ninety days after service of a suggestion of death, the trial court erred in denying the motion to dismiss.
Rule 25 states that the ninety-day time limit for substitution begins to run only after a suggestion of death issues "by service... as herein provided for the service of the motion." The Rule provides that the motion for substitution "shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of summons." The Hursts maintain that since Southwest did not effect Rule 4 service upon the Estate, the ninety-day period never commenced.
The Fifth Circuit Court of Appeals confronted a remarkably similar situation in Ransom v. Brennan, 437 F.2d 513 (5th Cir.1971). In Ransom, the defendant died prior to trial, and the plaintiff moved to substitute the defendant's executrix. The motion was served upon the decedent's attorney pursuant to Rule 5. The executrix apparently had actual knowledge of the motion but never received Rule 4 service as a non-party. The fifth circuit held that the plaintiff had failed to fulfil the service requirements of FRCP Rule 25, a rule virtually identical to MRCP Rule 25. The court explained:
The record does not show that Kline [the deceased defendant's attorney] was attorney for the executrix when the motion was served on him. And, even if he were, service of process is not effectual on an attorney solely by reason of his capacity as attorney. Rule 4(d)(1) allows service on an agent only if "authorized by appointment or by law to receive service of process." See generally 4 Wright & Miller, Federal Practice and Procedure: Civil § 1097.
The appellee contends that under the circumstances the service requirements of Rule 25(a)(1) should be relaxed. He asserts that the executrix must have had actual notice of the motion, pointing to the service of the motion itself on Kline, who had been the decedent's attorney, to Kline's subsequent appearance for the executrix and to the fact that the executrix filed no denial that Kline was attorney for her at the time he received the motion. Assuming the executrix had such actual notice, which plaintiff infers that she must have had, it would not operate as a substitute for process. "Indeed, whenever a defendant comes into court to challenge the service of process he, of necessity, has received notice of the suit, but, clearly mere `notice' is not a sufficient ground upon which a court can sustain the validity of service of process... ." Berner v. Farny, 11 F.R.D. 506, 509 (D.N.J. 1951).
Ransom, 437 F.2d at 519.
Southwest did not fulfil Rule 25's requirement concerning service on non-parties when it mailed a copy of the Suggestion of Death to the plaintiffs' attorney. The record suggests that the Hursts' attorney had not yet been appointed counsel for Josie Connerly's estate. In any event, there is no showing that the attorney had been authorized to act as the estate's agent for service. It is probable that executrix Geraldine Hurst had actual notice of the service on her personal attorney. But as explained in Ransom, "mere notice" is not enough to satisfy the service requirements of Rule 4.
Since Southwest did not properly serve the Estate of Josie Connerly, the ninety-day limitations period never began to run. The trial court did not err in denying Southwest's motion to dismiss Josie Connerly as a party plaintiff and in allowing the plaintiffs to substitute parties more *387 than ninety days after Southwest filed its Suggestion of Death.

III.

WHETHER THE TRIAL COURT ERRED IN REFUSING TO DISMISS HILDA BURNETT AS A PARTY DEFENDANT?
Burnett no longer lived in Mississippi when plaintiffs filed their suit in June of 1986. For undisclosed reasons, the Hursts did not attempt to serve Burnett until August 15, 1989, at which time they served the Secretary of State. Sometime prior to September 12, 1989, a certified letter from the Secretary of State to Hilda Burnett was returned bearing the postal notation "unclaimed." Southwest filed a motion on September 18, 1989, to dismiss Hilda Burnett as a party defendant for failure of the plaintiffs to properly serve Burnett with process. The motion also requested the court to quash the Secretary of State's attempted service of process. On September 20, Burnett filed a document styled:
JOINDER BY HILDA BURNETT, SPECIALLY APPEARING AND WITHOUT WAIVING ANY OF HER RIGHTS, IN THE MOTION TO DISMISS HILDA BURNETT AS A PARTY-DEFENDANT FILED BY DEFENDANT SOUTHWEST MISSISSIPPI LEGAL SERVICES
The trial court entered an order quashing the Hursts' attempted service of process on Burnett but did not grant the defendants' motion to dismiss Burnett as a party defendant. The case proceeded to trial in the October term of court with Burnett still named as a party defendant.
Southwest and Burnett insist that according to the style of Burnett's motion, she entered only a special appearance and did not appear for purposes of submitting herself to the general jurisdiction of the court. However, Mississippi does not recognize "special appearances" except where a party appears solely to object to the court's jurisdiction over his person on grounds that he is not amenable to process. Mladinich v. Kohn, 250 Miss. 138, 156, 164 So.2d 785, 791 (1964). Burnett's appearance does not fit that category. The trial court, therefore, properly deemed her to have appeared generally for all purposes.
Southwest and Burnett argue that the trial court should have dismissed Burnett pursuant to MRCP Rule 4(h) despite any appearance she may have made. Rule 4(h) provides the following:
Time limits of service. If a service of the summons and complaint is not made upon a defendant and complaint is not made upon a defendant within 120 days after the filing of the complaint and the parties on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon motion.
Had Burnett not made a general appearance, Rule 4(h) would have mandated her dismissal because the Hursts have shown no good cause for their failure to serve Burnett within 120 days. One waives process and service, however, upon making a general appearance. See Arrow Food Distributors, Inc. v. Love, 361 So.2d 324 (Miss. 1978), cert. denied, 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979); Sandifer v. Sandifer, 237 Miss. 464, 115 So.2d 46 (1959). By appearing on September 20, 1989, Burnett subjected herself to the jurisdiction of the Pike County Circuit Court and waived all objections to improper or insufficient service of process.

IV.

WHETHER THE HURSTS SHOULD BE SANCTIONED FOR FILING A FRIVOLOUS APPEAL?
Rule 38 of the Mississippi Supreme Court Rules states that in a civil case, "if this Court shall determine that an appeal is frivolous, it shall award just damages and single or double costs to the appellee." In McGowan v. Marx, 546 So.2d 699, 700 (Miss. 1989), the Court evaluated Rule 38 frivolity by reference to Tricon Metals & Services, Inc. v. Topp, 537 So.2d 1331 (Miss. 1989), a MRCP Rule 11 case. Tricon *388 held that an action is "frivolous ... only when, objectively speaking, the pleader or movant has no hope of success." The instant case certainly does not fit that description. Southwest's and Burnett's request for sanctions is therefore denied.

CONCLUSION
The trial court erred in granting Southwest's motion for summary judgment since Southwest failed to demonstrate the absence of a genuine issue of material fact and failed to show that it was entitled to judgment as a matter of law. We additionally observe that the trial court's grant of summary judgment in favor of Hilda Burnett was erroneous regardless of the merits of the motion since Burnett did not join Southwest in seeking summary judgment.
The trial court properly denied Southwest's motion to dismiss Josie Connerly, deceased, as a party plaintiff. Although a motion to substitute was not filed within ninety days of the time when Southwest filed a Suggestion of Death, the ninety-day limitations period for such motions never began to run since Southwest did not properly serve the Suggestion of Death on the Estate of Josie Connerly. The trial court also properly denied the defendants' motion to dismiss Hilda Burnett as a party defendant for insufficient service of process. Burnett made a general appearance in order to join the motion to dismiss and thus waived service of process. The appellee's request for Rule 38 sanctions has no merit.
Finding that the Hursts are entitled to a trial on the merits, we reverse the trial court's entry of summary judgment and remand for trial. We affirm the trial court on all matters raised on cross-appeal.
REVERSED ON DIRECT APPEAL AND REMANDED FOR TRIAL; AFFIRMED ON CROSS-APPEAL.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, J., concur.
BANKS, J., concurs in the results with separate written opinion joined by HAWKINS, P.J., and SULLIVAN, J.
PITTMAN, J., not participating.
ROBERTS, J., not participating according to supreme court internal rules.
BANKS, Justice, concurring:
I agree with the result reached by the majority with respect to both the appeal and cross-appeal. I write separately to express my disagreement with pronouncements which I believe to be unwarranted.
The majority correctly notes that the motion for summary judgment should have been denied because there is a genuine dispute of material fact as to whether Connerly acquired title by adverse possession.
I also agree that it is improper to conduct a summary judgment hearing without notice to the opposing party. It is difficult to see how, in the instant case, the lack of notice harmed the plaintiff, however, in that the same arguments and indication of evidence necessary to defeat a directed verdict were available to defeat the motion for summary judgment. Moreover, plaintiffs did not raise the issue of notice before the trial court and have not raised it here. Plaintiffs' contention throughout has been that summary judgment was improper on the merits not because of the timing of presentation and ruling.
This brings up another point of disagreement with the majority. In my view, it is unnecessary and ill-advised to pronounce, as the majority does, a blanket prohibition against granting summary judgment at or during trial. Majority opinion, ante at pp. 384-85. While the circumstances may be rare, the grant of summary judgment, where appropriate, even after trial has commenced, may save untold thousands of dollars, judicial hours and inconvenience to the parties. Miss.R.Civ.P. 56 provides that a motion for summary judgment may be made at any time and does not limit the time for adjudication. See, Utility Control Corporation, v. Prince William Construction Co., 558 F.2d 716, 719 (4th Cir.1977) (Noting no prohibition for the rare case but reversing on the notice issue.) We should not read such a limitation into the rule.
*389 Obviously, at trial summary judgments should be rarely granted and never without appropriate notice of an intent to consider the motion at that time, absent agreement of the parties. That said, however, it is unnecessary to foreclose use of this device in the rare instances where partial or total summary judgment is both appropriate on the merits and advisable from the standpoint of economy. "The principles governing summary judgment procedure should be applied in a common sense manner to the realities of the litigation at hand." Williams v. Howard Johnson's Inc. of Washington, 323 F.2d 102, 105 (4th Cir.1963). See also, H.J. Heinz Co. v. Beech-Nut Life Savers, Inc. 181 F. Supp. 452, 459 (S.D.N.Y. 1960) (Holding that a motion for summary judgment made on the eve of trial would be considered where it "might have the salutory effect of narrowing the issue for trial.")
Finally, I note disagreement with the rationale for the resolution of the statute of limitations issue in Part I.B. of the majority opinion. I find no support for the statement that we have compelled election of remedies in some legal malpractice cases. The only case cited, Hutchinson v. Smith, 417 So.2d 926 (Miss. 1982), pronounces no such compulsion. What we have compelled is proceeding in the alternative in order to avoid double recovery where appropriate. Singleton v. Stegall, 580 So.2d 1242 (Miss. 1991). It should suffice for present purposes to note that plaintiffs clearly alleged negligence in the conduct of the original defense and that at that time such a remedy was governed by a six-year statute of limitations.
Whether an allegation of bad faith breach of contract is an allegation of an independent tort for statute of limitations purposes is an issue not previously addressed by this Court. We have clearly held, however, that that such claims are separate and independent of the contract claim. Weems v. American Sec. Ins. Co., 486 So.2d 1222, 1226 (Miss. 1986). In my view no limitations statute other than the general statute fits this claim, and I therefore join the majority in adopting it. See, Nichols v. Tri-State Brick Co., 608 So.2d 324 (Miss. 1992).
HAWKINS, P.J., and SULLIVAN, J., join this opinion.
NOTES
[1] Defendant Southwest's discovery requests, motions, and the responses thereto occupy 602 pages of the record. The plaintiffs' discovery and motions take up nine pages.
[2] Hutchinson holds that "[w]here a party has two or more remedies for enforcement of a right, the fact that one remedy is barred by the statute of limitations does not bar the other remedies. However, where a plaintiff elects one of two remedies and such action is barred by the statute of limitations, the plaintiff is bound by his election and cannot thereafter resort to the other remedy for which a different limitation is provided." Hutchinson, 417 So.2d at 928.
[3] In 1990, the limitation set out in the catch-all statute was shortened to three years. See Miss. Code Ann. § 15-1-49 (1991).